UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | |
|---|---|
| GLORIA DYE, ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | 3:09-cv-030-RLY-WGH |
| ) | |
| STATE OF INDIANA DEPARTMENT OF ) | |
| CORRECTION, WABASH VALLEY ) | |
| CORRECTIONAL FACILITY, ) | |
| Defendants. ) | |

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Gloria Dye ("Plaintiff"), worked as a Captain for the Indiana Department of Correction at the Wabash Valley Correctional Facility (collectively "WVCF") in Carlisle, Indiana, and retired from that position in February 2011. In Counts I and III of her Complaint, Plaintiff, a Mexican American, alleges that her superiors at WVCF "continuously" discriminated against her on the basis of her gender, race, and national origin since approximately 2005, and that, after she complained of this discrimination, WVCF retaliated against her, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), and 42 U.S.C. § 1981 respectively ("Section 1981"). In Count II, Plaintiff alleges that WVCF discriminated against her based upon her age (she is over sixty), in violation of the Age Discrimination in Employment Act ("ADEA"). And in Count IV, Plaintiff alleges that WVCF retaliated against her for taking leave under the Family Medical Leave Act (FMLA) to care for her ailing Mother. Defendants now move for

1

summary judgment. For the reasons set forth below, the motion is **GRANTED**.

I.   **Background**

Plaintiff began her employment at WVCF on June 27, 1992, as a correctional officer. (Deposition of Gloria Dye ("Plaintiff Dep.") at 6, 9). In 1994 or 1995, she was promoted to the position of Sergeant, and a few years later, she was promoted to the position of Lieutenant. (*Id*. at 10, 15). Plaintiff has held the position of Captain for over ten years. (*Id*. at 24). As Captain, Plaintiff originally worked the night shift for eight years (4:30 p.m. to 4:30 a.m.). (*Id*. at 36, 51). Plaintiff worked three days, and was off for four days. (*Id*. at 36). Over her objection, she was transferred to the day shift for two years, and then returned to the night shift for the last two years of her employment. (*Id*. at 51). The Captain is the highest ranking official to work the night shift, and only one works the night shift at WVCF. (*Id*. at 34-35). As Captain, Plaintiff supervised the whole facility, all the staff, and responded to emergencies. (*Id*. at 34).

WVCF employs one Major, Dusty Russell ("Major Russell"). Major Russell worked the day shift (7:30 a.m. to 3:30 p.m.), and was Plaintiff's supervisor for five years (from roughly 2003-2008). (*Id*. at 62). The specific allegations in this case are disjointed and largely dependent upon Plaintiff's deposition testimony. As best as the court can discern, her allegations principally surround the discipline she received, and the racist letters she received, while employed as Captain under the supervision of Major Russell.

Major Russell, in Plaintiff's opinion, singled her out, and "made it very clear" that he did not like her. (*Id*. at 62-63). Plaintiff felt that Major Russell discriminated against

her "by the way he looked at [her], refused to answer [her] questions, ignored [her]," and gave her a "look of disgust when [she] would ask him a question or try to speak to [him]." (Affidavit of Gloria Dye ("Plaintiff Aff." ¶ 9). When she worked the night shift, Major Russell would "leave [her] nasty notes, or nasty e-mails." (Plaintiff Dep. at 54). Sometimes, he would wait for her shift to begin, and yell at her in person. (*Id*.).

In 2004, Plaintiff requested, and was granted, FMLA leave[1] to care for her dying Mother. (*Id*. at 84-85; Plaintiff's Ex. 12). Plaintiff testified that prior to that time, she had never been disciplined. (Plaintiff Aff. ¶ 4). However, in February 2005, she received a Letter of Reprimand from then-Captain Russell for failing to properly report the assault of a cook at the facility. (Plaintiff Dep. Ex. 24).

In June 2005, Plaintiff found a racist letter taped to her computer at the facility. (Plaintiff Dep. Ex. 7). Plaintiff filled out an Incident Report Form, and notified a person by the name of Major Crabb. (Plaintiff Dep. Ex. 2). Plaintiff noted in the Incident Report Form that the letter was handled by four other people, one of whom was a man named Lieutenant White, who was under her command. (*Id*.). The Office of Internal Affairs determined that this fell within the definition of a hate crime, and referred the matter to the Federal Bureau of Investigation ("FBI"), (Plaintiff Dep. Exs. 1, 3), who referred the matter back to Internal Affairs. (Plaintiff Ex. 13 at OUT 004431).

---

[1] Plaintiff testified that she took FMLA leave three times during her employment. Her testimony fails to give specific dates – even the year – that she took leave to care for her Mother or her Father. (*See* Plaintiff Dep. at 84-85). Her 2004 Absentee Calendar, however, contains a few handwritten notes which state "FML/Mother." (*See* Plaintiff's Ex. 12).

3

During the investigation, Internal Affairs asked her who she "was not getting along with then," and she named Major Russell, Lieutenant White, and a man named Lieutenant Eaton. (*Id*. at 118, 120). Plaintiff suspects that Major Russell or Lieutenant White, or Lieutenant Eaton, "or all three together," were involved because they wanted her to change her shift from the night shift to the day shift. (Plaintiff Dep. at 118). She theorizes that Lieutenant White and Lieutenant Eaton "wanted her shift so badly" that they decided to "scare [her] out of being on nights." (*Id*. at 118). She also testified that Lieutenant White told her that the letter had been near her computer for a couple of days, so he taped the letter to her computer so that she would see it. (*Id*. at 120-21).

Internal Affairs ultimately determined that "[t]here was no chain of custody maintained by those who came in possession of the letter and envelope after it left the possession of [Plaintiff]," and that, other than Plaintiff's "suspicions[,] there is nothing more to follow up on." (Plaintiff Ex. 13 at OUT 004428).

Plaintiff received two other racist letters after her switch to the day shift in August of 2005, but there was never an investigation conducted to determine who sent them. (*Id*. at 124).

In February 2006, she received a Memorandum entitled Pattern of Abuse of Time from Captain Russell for having too many absences "on the Wednesday and Thursday before [the] weekend." (Plaintiff Dep. Ex. 8). Citing to Plaintiff's 2005[2] Absentee

---

[2] Plaintiff also cites to her 2004 Absentee Calendar in support of her position. Because the Memorandum dealt with absences in 2005, the court fails to see the relevance of the 2004 calendar entries.

4

Calendar, Plaintiff states that most of her absences were approved leave under the Family Medical Leave Act to care for her dying Mother. (Plaintiff's Ex. 11). The court cannot determine the veracity of Plaintiff's position, since she does not explain what the marks on the calendar, including "R", "I", and "V", mean. In addition, in May 2006, she received a Memorandum from Emergency Response Operation Sitcon Commander Jason Irvine for missing two meetings in the past six months "without prior notification or valid excuse." (Plaintiff Dep. Ex. 15).

In an email dated December 22, 2006, from then-Superintendent Alan Finnan to Major Russell (among others), the Superintendent noted that "a plan to address the unacceptable job performance of Captain Dye and Captain Myers" was underway. (Plaintiff Dep. Ex. 6). The email stated that "both captains are going to be relieved of their responsibilities as Shift Supervisor." (*Id.*). For reasons unexplained, Plaintiff was never relieved of her responsibilities as Shift Supervisor. (Plaintiff Dep. at 125).

In January 2007, Major Russell issued a 90-day Work Improvement Plan for Plaintiff. (Plaintiff Dep. Ex. 30). The Work Improvement Plan noted that Plaintiff did not provide effective supervision of Correctional Staff and failed to properly review and distribute reports, and keep shift logs up to date. (*Id.*). During this time, Plaintiff worked under the supervision of Captain Nancy Barnett ("Captain Barnett") to improve her overall skills. (Plaintiff's Ex. 2). Captain Barnett's evaluation of Plaintiff was good, and Plaintiff did not receive any discipline during this time period. (*Id.*).

On August 22, 2007, Major Russell issued Plaintiff a Letter of Written Reprimand

5

for calling in 11.5 hours of sick leave, when she only had 11 hours of accumulated sick and vacation time to take. (Plaintiff Dep. Ex. 16).

On January 11, 2008, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission, and received a notice of right to sue on December 12, 2008. (Plaintiff Dep. Ex. 28).

On April 3, 2008, Plaintiff had a pre-deprivation meeting regarding an incident wherein it was determined that she did not follow proper procedure regarding an inmate who attempted suicide. (Plaintiff Dep. Ex. 10; *see also* Plaintiff Dep. Exs. 9, 18). Rather than issue a three-day suspension as originally planned, Assistant Superintendent Brian Smith issued Plaintiff a written reprimand. (Plaintiff Dep. Ex. 11).

Plaintiff retired from the WVCF in February 2011. (Plaintiff Aff. ¶ 15).

## II.    Summary Judgment Standard

Summary judgment is proper only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of informing the court of the basis for its motion and demonstrating the "absence of evidence on an essential element of the non-moving party's case," *Celotex Corp.*, 477 U.S. at 323, 325. To withstand a motion for summary judgment, the nonmoving party may not simply rest on the pleadings, but rather must "make a showing sufficient to establish the existence of [the] element[s] essential to that party's case, and on which that party will bear the burden of proof at trial. . .". *Id*. at 322.

If the non-moving party fails to make this showing, then the moving party is entitled to judgment as a matter of law. *Id.* at 323.

In determining whether a genuine issue of material fact exists, the court must view the record and all reasonable inferences in the light most favorable to the non-moving party. *See Nat'l Soffit & Escutcheons, Inc. v. Superior Sys., Inc.*, 98 F.3d 262, 264 (7th Cir. 1996). No genuine issue exists if the record viewed as a whole could not lead a rational trier of fact to find for the non-moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Ritchie v. Glidden Co.*, 242 F.3d 713, 720 (7th Cir. 2001).

## III. Discussion

As an initial matter, Plaintiff concedes that her age discrimination claim under the ADEA is barred by the Eleventh Amendment doctrine of sovereign immunity. Accordingly, the court now turns to Plaintiff's Title VII gender, race, and national origin claims. These claims are based on her belief that she has suffered continuous discrimination since approximately 2005.

### A. Title VII Discrimination Claims

A Title VII plaintiff may prove intentional discrimination through either the direct or indirect method of proof. *Antonetti v. Abbott Labs.*, 563 F.3d 587, 591 (7th Cir. 2009). Plaintiff proceeds only under the indirect, burden-shifting approach first enunciated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Thus, in order to prevail, a plaintiff must first establish a prima facie case of discrimination. This requires the

plaintiff to establish that: (1) she is a member of a protected class; (2) she was performing her job to her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of the protected class were treated more favorably. *Antonelli*, 563 F.3d at 591 (race and national origin); *Farrell v. Butler Univ.*, 421 F.3d 609, 613 (7th Cir. 2005) (gender discrimination). The failure to establish any one of these elements is fatal to a plaintiff's claims. *Traylor v. Brown*, 295 F.3d 783, 790 (7th Cir. 2002).

1. **Adverse Employment Action**

Adverse employment actions affect the terms and conditions of one's employment, typically resulting in economic injury. *Whittaker v. Northern Ill. Univ.*, 424 F.3d 640, 648 (7th Cir. 2005). While adverse employment actions "are not limited to loss or reduction in pay or monetary benefits," the actions complained of must "materially alter the terms and conditions of employment." *Id*. (internal quotations and citations omitted). Examples of material adverse actions "include termination, demotion accompanied by a decrease in pay, or a material loss of benefits or responsibilities." *Crews v. City of Mt. Vernon*, 567 F.3d 860, 869 (7th Cir. 2009) (citing *Lapka v. Chertoff*, 517 F.3d 974, 986 (7th Cir. 2008)). Negative performance evaluations, unfair reprimands, and written warnings, while "putatively disciplinary measures," without more, do not constitute adverse employment actions. *Whittaker*, 424 F.3d at 648; *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 729 (7th Cir. 2001) ("[U]nfair reprimands or negative performance evaluations, unaccompanied by some tangible job consequence, do not constitute adverse employment

8

actions.").

In support of her claim, Plaintiff summarily states that she "has pointed to disciplinary actions which are part of Defendant's progressive discipline system, harassment and many other actions designed to harass and humiliate her." (Plaintiff's Response at 16). Without more explanation as to the basis of her claim, the court turns to the record in this case, which reflects that between February 2005 and April 3, 2008, Plaintiff received a Letter of Reprimand, three Written Reprimands, a Work Improvement Plan, and two Memorandums regarding her attendance. These types of "discipline" are not adverse employment actions, particularly where, as here, she suffered no tangible job consequence. She maintained her position as Captain at the same rate of pay, and suffered no material change in benefits or responsibilities.

### 2. Similarly Situated Individuals

Employees are similarly situated to a plaintiff/employee if they are not members of the protected class (i.e., non-Hispanic males), but comparable to the employee "'in all material respects.'" *Kindler v. Potter*, 197 Fed.Appx. 515, 517-18 (7th Cir. 2006) (quoting *Crawford v. Ind. Harbor Belt R.R. Co.*, 461 F.3d 844, 846 (7th Cir. 2006)). In a disciplinary case – in which the plaintiff alleges that she was disciplined more harshly than other similarly situated employees – this requires the "plaintiff to show that [s]he is similarly situated with respect to performance, qualifications, and conduct." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000). Plaintiff contends that she was the only Hispanic female Captain at WVCF and that she was, indeed, treated differently

than all other Captains. (Plaintiff's Response at 17). Her conclusory assertion that she is not treated as well as "other Captains" is insufficient to establish this critical element of her prima facie case. Having failed to identify even one similarly situated individual, and having failed to show that she suffered an adverse employment action, Plaintiff's prima facie case is doomed.

### B. Title VII Retaliation Claim

A Title VII plaintiff may establish retaliation under both the direct and indirect methods of proof, *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 662 (7th Cir. 2006), and here, Plaintiff proceeds under both. Under the direct method, a plaintiff must show that: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse action. *Id*. at 663. Under the indirect method of proof, a plaintiff must first establish a prima facie case of discrimination. This requires her to show that: (1) she engaged in statutorily protected activity; (2) she met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Id*.

Statutorily protected activity exists if the employee "has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2003-3(a). Plaintiff alleges that she engaged in protected activity when she filed an incident report with the IDOC on June 1,

10

2005, reporting the anonymous hate mail she found taped to her work computer. (*See* Plaintiff's Response at 19) (stating that her protected activity consists of her "send[ing] in the complaint of racial hate to the IDOC"). Filing an incident report does not fit within the statutory definition of protected activity, because she was not opposing an unlawful employment practice that is prohibited by Title VII, such as WVCF's discriminatory practices. *Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 224 F.3d 701, 707 (7th Cir. 2000) (holding that the conduct complained of "must involve discrimination that is prohibited by Title VII").

Moreover, Plaintiff presents no evidence to support an inference of a causal connection between the hate mail incidents and her disciplinary write-ups, a necessary element of her direct case. All she has is a timing argument; Plaintiff claims that after she received the hate mail and complained, she was disciplined. (*See* Plaintiff's Response at 20) ("It seems that discipline directly followed every complaint of discrimination made by Gloria Dye and Defendant cannot justify its actions."). "On summary judgment, in particular, 'it is clear that mere temporal proximity is not enough to establish a genuine issue of material fact.'" *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th Cir. 2008) (quoting *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004)). Thus, even were the court to accept Plaintiff's incident report as a complaint of gender, race, or national origin discrimination, she could not establish a genuine issue for trial. Nor could Plaintiff present a retaliation claim under the indirect method, given the fact that she presents no similarly situated individuals outside the protected class who were

treated more favorably. Accordingly, Plaintiff's retaliation claim brought under the direct and indirect methods of proof fails on the merits.

C. **Section 1981 Claims**

Plaintiff also brings her discrimination claims under Section 1981. Both Title VII and Section 1981 provide that a plaintiff may prove employment discrimination under either the direct or indirect method of proof. *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1060-61 n.4 (7th Cir. 2003). Accordingly, because "the claims rise and fall together," *Antonetti*, 563 F.3d at 591 n.4, Plaintiff's Section 1981 gender, race, national origin, and retaliation claims likewise fail on the merits.

D. **FMLA Retaliation**

Finally, Plaintiff alleges that after she took FMLA leave in 2005 to care for her Mother, WVCF "orchestrated a campaign of harassment against her." (Complaint, Count IV, ¶ 7). WVCF contends that Plaintiff's FMLA retaliation claim is barred by the doctrine of sovereign immunity. The case that WVCF cites for this proposition, *Toeller v. Wisconsin Dep't of Corrections*, 461 F.3d 871 (7th Cir. 2006), held that Congress did not validly abrogate state sovereign immunity in enacting the self-care provision of the FMLA. Plaintiff's FMLA claim is not brought under the self-care provision; rather, it is brought under the family-leave provision of the FMLA. Contrary to WVCF's position, Plaintiff's claim under the family-leave provision of the FMLA is not barred by the doctrine of sovereign immunity. *See Nevada Dep't of Human Resources v. Hibbs*, 538 U.S. 721 (2003). As this is WVCF's only argument in support of summary judgment,

Plaintiff's FMLA retaliation claim remains.

**IV.   Conclusion**

For the reasons set forth above, the court finds that there is no genuine issue of material fact for trial with respect to Plaintiff's Title VII and Section 1981 claims of discrimination and retaliation. The court further finds that Plaintiff's ADEA claim is barred by the doctrine of sovereign immunity, but that Plaintiff's FMLA retaliation claim remains. Accordingly, Defendants' Motion for Summary Judgment (Docket # 43) is **GRANTED** with respect to Plaintiff's Title VII, Section 1981, and ADEA claims, and **DENIED** with respect to Plaintiff's FMLA retaliation claim.


**SO ORDERED** this 12th  day of July 2011.

_____
RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana


Electronic Copies to:

Laura Lee Bowker
INDIANA ATTORNEY GENERAL
laura.bowker@atg.in.gov

Darlene Carole Robinson
ROBINSON & ASSOCIATES
office@olearylaw.net